[Cite as *State ex rel. Gen. Motors Co. v. Webster*, 2014-Ohio-2791.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel.          :
General Motors Company,
                               :
          Relator,
                               :
v.                                              No.  13AP-931
                               :
Dionicia Webster and Industrial                 (REGULAR CALENDAR)
Commission of Ohio,            :

          Respondents.         :

                               :

                    D E C I S I O N

              Rendered on June 26, 2014

*Bugbee & Conkle, LLP,* and *Mark S. Barnes*, for relator.

*Mary Brigid Sweeney Co. LLC,* and *Mary Brigid Sweeney,*
for respondent Dionicia Webster.

*Michael DeWine*, Attorney General, and *Stephen D. Plymale,*
for respondent Industrial Commission of Ohio.

                    IN MANDAMUS
    ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1}   Relator, General Motors Company ("GM"), filed this action in mandamus, seeking a writ to compel the Industrial Commission of Ohio to recalculate the average weekly wage ("AWW") of Billy Webster, deceased.

{¶ 2}   In accord with Loc.R. 13(M) of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings.  The parties stipulated

the pertinent evidence and filed briefs.  The magistrate then issued a magistrate's decision, appended hereto, which contains detailed findings of fact and conclusions of law.  The magistrate's decision includes a recommendation that we deny GM's request for a writ of mandamus.

{¶ 3}   GM has filed objections to the magistrate's decision.  Counsel for Dionicia Webster, Billy Webster's widow, has filed a memorandum in response.  The case is now before the court for a full, independent review.

{¶ 4}   Webster died from complications associated with mesothelioma.  He got mesothelioma as a result of inhaling asbestos particles while he worked for GM.  None of this is in debate.

{¶ 5}   After his death, his widow applied for benefits from the Ohio's Workers' Compensation System.  GM, a self-insured employer, has consistently tried to minimize the money it has to pay to Webster's widow, first resisting the death benefits and then fighting recognition of the claim all the way into common pleas court in Defiance County.

{¶ 6}   GM initially failed to provide pay records for Webster, making computation of his AWW difficult.  A district hearing officer ("DHO") finally used records from the Social Security Administration to assign AWW at the statutory maximum of $775.

{¶ 7}   GM argued that it owed the widow less money because Webster had retired from GM before he died.  The information before us indicates that Webster had shortness of breath while on the job which led to his being hospitalized.  Later that month, he had surgery which revealed the mesothelioma.  He never returned to work and died less than one year later.

{¶ 8}   The commission used the date Webster's problems were diagnosed as flowing from mesothelioma as the date to start the computation of AWW.  Webster had earned over $70,000 during the 12 months prior to diagnosis.  The statutory maximum was clearly appropriate, whether the start date for computing AWW has the date of diagnosis or date of disability.

{¶ 9}   Our magistrate has set forth more detail about why the commission orders are correct.  We overrule the objections filed on behalf of GM and adopt the magistrate's findings of fact and conclusions of law.

{¶ 10} The commission was clearly within its discretion to find his retirement was not voluntary. The assertion that the widow should be compensated at the state minimum is without merit.

{¶ 11} The request for a writ of mandamus is denied.

*Objections overruled; writ denied.*

SADLER, P.J., and O'GRADY, J., concur.

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel.<br>General Motors Company, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No. 13AP-931 |
| | : | |
| Dionicia Webster and Industrial<br>Commission of Ohio, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N

### Rendered on April 30, 2014

---

*Bugbee & Conkle, LLP,* and *Mark S. Barnes*, for relator.

*Mary Brigid Sweeney Co. LLC,* and *Mary Brigid Sweeney,* for respondent Dionicia Webster.

*Michael DeWine*, Attorney General, and *Stephen D. Plymale,* for respondent Industrial Commission of Ohio.

### IN MANDAMUS

{¶ 12} Relator, General Motors Company, has filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which calculated the average weekly wage ("AWW") of Billy Webster ("decedent"), and ordering the commission to redetermine decedent's AWW.

**Findings of Fact:**

{¶ 13} 1. On April 6, 2009, while at work, decedent felt short of breath and was taken to the emergency room. Tests performed that day revealed the following: att. 2

{¶ 14} [One] Large right side pleural effusion with near complete collapse of the right lung.

{¶ 15} [Two] Probable pleural mass in the upper part of the right hemithorax that measures 1.5 cm in diameter suggesting a neoplastic process.

{¶ 16} [Three] Right adrenal gland nodule measures approximately 1.7 cm in diameter.

{¶ 17} It shows decreased attenuation suggesting a benign nonfunctioning adenoma.

{¶ 18} [Four] Decreased attenuation lesion in the medial aspect of segment #5 of the liver measures 1.5 cm in diameter. It cannot be fully characterized based on this study alone. It may represent a cyst or a metastatic lesion.

{¶ 19} 2. On May 6, 2009, a biopsy confirmed the following: "[p]ositive for malignancy. Malignant mesothelioma."

{¶ 20} 3. Decedent commenced chemotherapy on May 21, 2009 and pursued a second course of treatment immediately thereafter. Unfortunately, chemotherapy was ultimately terminated because the tumor progressed.

{¶ 21} 4. During the course of chemotherapy, decedent experienced fatigue, numbness in his extremities, fevers, night sweats, joint and back pain, and shortness of breath. Following chemotherapy, decedent experienced weight loss, decreased appetite, a rash, sinus congestion, chronic shortness of breath, a persistent cough, joint achiness, and swelling in his arm and right leg.

{¶ 22} 5. Decedent never returned to work and retired effective August 1, 2009.

{¶ 23} 6. Decedent died on March 19, 2010 from respiratory failure caused in significant part by his mesothelioma.

{¶ 24} 7. On July 15, 2011, decedent's widow, Dionicia Webster ("claimant"), filed a First Report of an Injury, Occupational Disease or Death, stating:

> Decedent was exposed to asbestos fibers while employed by GM Powertrain, causing him to develop and die from mesothelioma.

{¶ 25} 8. Relator contested the claim, and, on October 3, 2012, the matter was heard before a district hearing officer ("DHO"). The DHO granted claimant's application for death benefits after finding decedent had developed mesothelioma as a result of an injurious exposure to asbestos which ultimately lead to his death on March 19, 2010. The DHO also found that, at the time of decedent's death, claimant was wholly dependent upon him. The DHO concluded with the following directive to relator:

> Based on all of the above findings, this District Hearing Officer finds the Widow claimant has established a compensable death claim by a preponderance of the evidence.
>
> Medical, hospital and funeral expenses are ordered to be paid in accordance with the statute and the rules of the Ohio Bureau of Workers' Compensation and the Industrial Commission.
>
> The Self-Insuring Employer is hereby ordered to comply with the above findings.
>
> The DHO also listed the date of injury and date of death both as March 19, 2010.

{¶ 26} 9. Relator filed an appeal and provided the following reason:

> Appealing the decision of the DHO 10/3/2012, await the hearing and decision of the SHO when scheduled.
>
> Compensation/benefits were NOT timely paid as mandated by R.C. 4123.511.
>
> Additional evidence will NOT be submitted.

(Emphasis sic.)

{¶ 27} 10. Relator's appeal was heard before a staff hearing officer ("SHO") on November 28, 2012. The SHO also granted claimant's application for death benefits filed

July 15, 2011 and provided additional rationale. The SHO also listed the date of injury and date of death both as March 19, 2010.

{¶ 28} 11. Relator appealed the SHO order for the following reasons:

> Vacate the SHO order and disallow the claim. An evidentiary analysis reveals the preponderance of the probative evidence fails to establish sufficient injurious exposure to asbestos while working for this employer to establish a causal nexus to the death of Mr. Webster. As such, the widow-claimant has failed to meet her burden of proof. Therefore, the claim should be disallowed in its entirety.
>
> Compensation/benefits were timely paid as mandated by R.C. 4123.511.
>
> Additional evidence will be submitted.

{¶ 29} 12. Relator's appeal was refused by order of the commission mailed December 19, 2012. This order also listed the date of injury and date of death as March 19, 2010.

{¶ 30} 13. Relator filed an appeal in the Defiance County Court of Common Pleas in February 2013.

{¶ 31} 14. Claimant's counsel sent a letter to relator's counsel on March 21, 2013 because claimant had not yet received benefits to which she was entitled. Specifically, that letter provided:

> As you know I represent Mrs. Webster in her workers['] Compensation action against your client General Motors Co. On November 30, 2012 the Industrial Commission of Ohio allowed her claim for death benefits. Your client's appeal was refused by the Industrial Commission on December 19, 2012. As of this date, Mrs. Webster has yet to receive benefits which she has patiently been waiting to receive.
>
> To date she is entitled to receive the $5,500.00 in funeral costs and death benefits dating back to March 19, 2010. Please forward the back award to my office as soon as possible. You may send the funeral expenses directly to Mrs. Webster * * *. I will assume that the current benefits will be sent to her address as prescribed by law.

{¶ 32} 15. In a letter dated March 25, 2013, counsel for relator responded, stating:

We are in receipt of your March 21, 2013 correspondence regarding the payment of funeral costs and death benefits in the above claim. Please supply us with documentation of the funeral expenses and General Motors will comply with the November 28, 2012 Staff Hearing Officer Order. However, upon review of the order, the Staff Hearing Officer failed to set forth General Motor's obligation to pay death benefits back to any date certain according to any specified rate. Unfortunately, unless and until the Commission orders specific payment of compensation, General Motors is unable to pay any death benefits.

{¶ 33} 16. In a letter dated March 26, 2013, counsel for claimant requested an expedited hearing on the issue of payment of death benefits.

{¶ 34} 17. In response, counsel for relator replied on April 1, 2013, as follows:

We are in receipt of your March 26, 2013 correspondence in the above claim. Please be advised we do not object to an expedited hearing on the issue of the payment of the death benefits. Also, please be aware General Motors has not obstructed payment of benefits in this claim, nor does the company have any interest in obstructing payment of benefits. However, as a self-insured employer, General Motors is required to comply with the orders of the Commission and the Bureau. As you are aware, the Commission speaks through its orders. When an order fails to set forth with specificity the obligation of the self-insured employer, the employer cannot be expected to infer information the Commission or its hearing officers have excluded from the order. In the present claim, the Commission did not order the payment of compensation or specify the rate of compensation.

Once the Commission sets forth an order specifying General Motors' obligation to pay compensation benefits, General Motors will comply with the order in accordance with the Commission rules. As per our March 22, 2013 correspondence, a copy of which is attached, please provide us with documentation (i.e. an invoice) for the funeral services and we will instruct General Motors to reimburse Ms. Webster accordingly, up to the statutory maximum of $5,500.00.

(Emphasis sic.)

{¶ 35} 18. Notice of hearing was mailed April 19, 2013. The notice included the following:

> Pursuant to Administrative Code 4121-3-13 (D) and (E) a self insuring employer or its authorized representative is required to submit to the IC and injured worker prior to a hearing on contested claims the following previously unfiled information: medical reports or consultations as provided by the rule, the FROI or equivalent, a statement listing the specifically allowed conditions, FWW or AWW unless set by the IC, last payment date of compensation or medical bill where the statute of limitations is an issue, last payment date of medical if the issue is a dispute over entitlement of medical benefits, or date of last compensation payment where the issue is entitlement to compensation.

{¶ 36} 19. A hearing was held before a DHO on May 7, 2013. The DHO noted that, despite the fact that relator had filed a notice of appeal in the Defiance County Court of Common Pleas pursuant to R.C. 4123.512, that appeal did not stay the payment of compensation or medical benefits under the award. Thereafter, the DHO discussed the correspondence between claimant's counsel and relator's counsel, specifically noting relator's explanation for why it had not yet made any payments to claimant, stating:

> It is the finding of this District Hearing Officer that the Staff Hearing Officer who conducted the hearing on 11/28/2012, was not able to set "any specified rate", due to the Employer's failure to comply with Ohio Administrative Code Section 4121-3-13 (E) (3), as the Self-Insuring Employer failed to submit, "the information used to calculate the full weekly wage or average weekly wage, depending on which is at issue", which said code section provides "shall be submitted unless the full weekly wage or average weekly wage had been previously established by a final order of the Commission."
>
> It is the further finding of this District Hearing Officer that the Employer was reminded of its obligation to submit that information, pursuant to Ohio Administrative Code Section 4121-3-13, on the face of the Notice of Hearing, which was issued for the District Hearing Officer[']s Hearing of 10/03/2012 and the Staff Hearing Officer's hearing of 11/28/2012. That Notice of Hearing specifically stated that, "Pursuant to Administrative Code 4121-3-13 (D) and (E), a self-insuring employer, or its authorized representative, is

> required to submit to the IC and injured worker, prior to a hearing on contested claims, the following previously unfiled or equivalent, a statement listing the specifically allowed conditions, FWW or AWW unless set by the IC ...".
>
> Furthermore, the Self-Insuring Employer received a similar notice in regard to today's hearing on the issue of payment of death benefits. Despite that language on the Notice of Hearing for today's hearing, the Employer, once again, has failed to submit the information necessary for calculation of the full weekly wage and average weekly applicable to this claim.

(Emphasis sic.)

{¶ 37} After finding that relator had failed to submit the information necessary for the commission to have calculated the AWW, the DHO made a determination based upon the best information available, records from the Social Security Administration. The DHO ordered the payment of death benefits as follows:

> Therefore, this District Hearing Officer relies upon the best information available, which is the Social Security records which were certified by the Division Director of the Social Security Administration on 02/27/2010. Those records indicate that the Injured Worker had social security earnings for the year of 2008 totaling $71,524.71.
>
> Therefore, it is the finding of this District Hearing Officer that the deceased-claimant's earnings would qualify the widow-claimant for the maximum weekly death award payment, pursuant to Ohio Revised Code Section 4123.59 (B).
>
> It is the further finding of this District Hearing Officer that ORC Section 4123.59 provides that the benefits in case of death shall commence as follows: "The payment as provided in this section shall continue from the date of death of an injured or disabled employee until the death or remarriage of such dependent spouse." Therefore, the statement by the employer's legal counsel that, "the Staff Hearing Officer failed to set forth General Motor's obligation to pay death benefits back to any date certain" is disingenuous, at best, as the self-insuring employer[']s obligation to pay death benefits back to "the date of death of an injured worker" is clearly set out by the statute itself.

Therefore, it is the order of this District Hearing Officer that the Self-Insuring Employer is hereby ordered to pay death benefits to the surviving spouse / widow-claimant, Dionicia Webster, in the amount of $775.00 per week, commencing from the date of death of 03/19/2010 and continuing thereafter without suspension, pursuant to Ohio Revised Code Section 4123.59, until the death or remarriage of such dependent spouse, subject to the continuing jurisdiction of the Industrial Commission, pursuant to Ohio Revised Code Section 4123.52.

(Emphasis sic.)

{¶ 38} Furthermore, the DHO ordered the payment of funeral expenses, stating:

It is the further finding of this District Hearing Officer that the widow claimant, Dionicia Webster paid the Den Herder Funeral Home, Inc., the sum of $11,472.22 for the funeral of deceased-claimant Billie Frank Webster.

Therefore, it the further order of this District Hearing Officer that the Self-Insuring Employer is hereby ordered to reimburse the widow claimant, Dionicia Webster, the sum of $5,500.00 for the payment of funeral benefits, pursuant to Ohio Revised Code Section 4123.66 (A).

(Emphasis sic.)

{¶ 39} As with the prior orders, this DHO order also set forth the date of injury and date of death as March 19, 2010.

{¶ 40} 20. Relator appealed and the matter was heard before an SHO on June 27, 2013. At this time, relator argued that decedent had retired for reasons unrelated to the allowed conditions in his claim; therefore, relator contended that death benefits should be paid at the statewide minimum because decedent had less than $6,000 in earnings for the year preceding his death. The SHO discussed the parties' arguments and determined that decedent did not take a voluntary retirement, stating:

Ms. Webster's Counsel agreed with the Average Weekly Wage setting such that the statewide maximum rate of $775.00 applies. The Employer argued that the Death Benefits payment should be at the statewide minimum, as Mr. Webster had been retired for almost a year before the

date of his death and had earnings of $5[,]617.56, which would lead to an Average Weekly Wage of $108.03. Therefore, the Self-Insuring Employer argued that the Death Benefits should be paid at the statewide minimum rate.

The Self-Insuring Employer made argument that the date of disability has been set at 03/19/2013 [sic]. Argument was made that the date of injury (diagnosis) was set at 03/19/2013 [sic], therefore, there could be no disability due to the allowed condition prior to that date. A review of the body of the District Hearing Officer's order issued 10/20/2012 shows that the Date of Death was found to be 03/19/2013 [sic]. This order did not specifically set the Date of Diagnosis or injury. A review of the body of the Staff Hearing Officer's order issued 11/30/2012 shows that the date of death was found to be 03/19/2013 [sic], but there was no specific finding of a Date of Diagnosis or date of disability.

Argument was made by Ms. Webster's Counsel that Mr. Webster retired due to his terminal illness. The Self-Insuring Employer argued that Mr. Webster retired at age 60 unrelated to this claim. Minimal information regarding the retirement is on file. However, it is clear that the last date worked was 04/06/2009 (Employer print out attached to memorandum filed 06/27/2013); Mr. Webster had some sort of medical event while at work leading to hospitalization on 04/06/2009 (04/15/2009 office note of Dr. Oukley) [sic]; and Mr. Webster was in surgery for his cancer on 04/30/2009 (05/15/2009 chart note of Dr. Oukley).

The medical records of Dr. Oukley [sic] are found to support the Widow Claimant's argument that Mr. Webster did not take a voluntary retirement for reasons other than his terminal illness. Therefore, this Staff Hearing Officer finds disability due to the allowed condition began on 04/06/2009 based upon the records of Dr. Oukley [sic] dated 04/15/2009 and 05/14/2009.

{¶ 41} Thereafter, the SHO discussed the evidence relator had filed and also concluded that decedent's AWW should be set at the statewide maximum, stating:

{¶ 42} O.R.C. 4123.61 currently states:

"The average weekly wage of an injured employee at the time of the injury is the basis upon which to compute benefits.

In death, permanent total disability claims, permanent partial disability claims, and impairment of earnings claims, the claimant's or the decedent's average weekly wage for the year preceding the injury or the date the disability due to the occupational disease begins is the weekly wage upon which compensation shall be based. In ascertaining the average weekly wage for the year previous to the injury, or the date the disability due to the occupational disease begins any period of unemployment due to sickness, industrial depression, strike, lockout, or other cause beyond the employee's control shall be eliminated."

The Average Weekly Wage is therefore found to be appropriately based upon Mr. Webster's earnings for the year prior to his disability which began 04/06/2009.

The Wages are * * * on file indicate earnings of $70,647.21 from 04/06/2008 through 04/05/2009. These earnings divided by 52 weeks equals an Average Weekly Wage of $1[,]358.60. Therefore, the appropriate Death Benefits rate would be the statewide maximum of $776.00 per week.

Therefore, it is the order of the Staff Hearing Officer that the Self-Insuring Employer is hereby ordered to pay death benefits to the surviving Spouse/Widow, Dionicia Webster, in the amount of $775.00 per week, beginning on the date of death, 03/19/2009 [sic], and continuing thereafter without suspension pursuant to Ohio Revised Code Section 4123.59, until the death or remarriage of such dependent spouse, subject to the continuing jurisdiction of the Industrial Commission pursuant to Ohio Revised Code Section 4123.52.

{¶ 43} As with the prior orders, this SHO order also set forth the date of injury and date of death as March 19, 2010.

{¶ 44} 21. Relator appealed and asserted that the SHO's reliance on the office records of Dr. Gary E. Okuley, M.D., was improper because neither office note supported the SHO's contention that decedent was disabled beginning April 6, 2009. Specifically, relator argued:

Because the Staff Hearing Officer incorrectly found Mr. Webster was disabled as of April 6, 2009, and because both the District Hearing Officer order and Staff Hearing Officer order allowing the claim set the date of injury or disability as

March 19, 2010, the order setting the average weekly wage as $775.00 is incorrect and based on both mistakes of fact and law.

{¶ 45} 22. The matter was heard before the commission on August 20, 2013. The commission granted relator's appeal finding that the SHO had failed to specify a date of diagnosis and modified the SHO's to reflect that change. In all other respects the SHO's order was affirmed. The commission ultimately concluded that death benefits should be paid at the statewide maximum. Specifically, the commission explained:

The Commission finds, pursuant to the prior order of the Staff Hearing Officer issued 11/30/2012, the widow-claimant's claim is compensable. Specifically, the Staff Hearing Officer found the widow-claimant's husband, Billie Webster (Decedent), had contracted mesothelioma as a result of his cumulative exposure to asbestos and asbestos products that was substantial and extensive in nature and occurring in the course of and arising out of his employment with the Employer as a furnace operator over a period of years. The Staff Hearing Officer further found the Decedent's death had resulted from that diagnosis and occupational exposure. However, the Commission finds in the order issued 11/30/2012, the Staff Hearing Officer did not specify a date of diagnosis for the occupational disease, resulting in the Decedent's death, nor was the weekly rate specified at which the Employer was to award death benefits.

The Commission finds the date of diagnosis for this occupational disease-related death claim is 05/06/2009, the date of the surgical pathology consultation report from Dennis LeGolvan, M.D., indicating the results of the Decedent's pleural biopsies, performed on 05/04/2009, were positive for mesothelioma. The Commission further finds for purposes of determining the Decedent's average weekly wage pursuant to R.C. 4123.61 and the resulting weekly rate of death benefits payable to the widow-claimant, the calculation is properly based upon the Decedent's gross earnings in the year prior to 05/06/2009. The Commission finds the wage records on file documenting the Decedent's gross wages during the period from 05/06/2008 through 05/06/2009, demonstrate that two-thirds of the Decedent's average weekly wage would exceed the statewide maximum rate of $775.00 per week for death benefits in a claim with a date of death occurring in 2010. Accordingly, the

Commission sets the weekly rate of death benefits payable to the widow-claimant at $775.00, the statewide maximum rate, pursuant to the formula set forth in R.C. 4123.59 and Memo H6 of the Industrial Commission Policy Statements and Guidelines.

{¶ 46} For the first time, the commission's order set forth decedent's date of diagnosis as May 6, 2009 and his date of death as March 19, 2010.

{¶ 47} 23. Thereafter, relator, General Motors Company, filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 48} Relator argues that the commission abused its discretion when it changed the nature of decedent's claim from an injury claim to an occupational disease claim and used decedent's date of diagnosis instead of the already determined date of injury to calculate his AWW. Relator also argues that the commission abused its discretion by finding that decedent's retirement was involuntary and in setting his AWW at the statewide maximum rate.

{¶ 49} For the reasons that follow, the magistrate rejects relator's arguments and finds the commission did not abuse its discretion.

{¶ 50} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 51} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of

discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 52} Relator makes much of the fact that, at the top of the initial commission orders, decedent's "date of injury" is set forth as March 19, 2010, the same day decedent died. Relator asserts that the commission must have decided to treat this claim as an injury claim and not an occupational disease claim. Such a conclusion would benefit relator because relator wants this court to find that March 19, 2010 is the proper date the commission must use to calculate decedent's AWW. When the March 19, 2010 date is used, decedent's AWW is based on the approximately $6000 decedent earned in the preceding year and would result in decedent's AWW being set at the statewide minimum of $387.50. Instead, the commission used May 6, 2009, the date of diagnosis, to calculate decedent's AWW and set decedent's AWW at the statewide maximum of $775.

{¶ 53} Relator appears to advance the following theories to support its assertion: (1) the commission speaks through its orders and clearly decided to treat this as an injury claim and not an occupational disease claim; and (2) principles akin to res judicata apply and the commission could not change the claim from an injury claim to an occupational disease claim. For the reasons that follow, the magistrate disagrees.

{¶ 54} First, without citing every case involving mesothelioma, the magistrate notes that mesothelioma has consistently been considered an occupational disease. This disease has a long latency period. The magistrate did not find any cases where it was treated as an injury.

{¶ 55} Second, this claim is somewhat unusual. Ordinarily, the injured worker files the claim. Here, decedent died 10 months after the date of diagnosis and never filed a claim for benefits. Instead, because decedent had already died, his surviving spouse (claimant) filed this claim as a death claim. As claimant's counsel points out, the surviving spouse's death claim did not arise until decedent's death on March 19, 2010.

{¶ 56} Third, because relator failed to supply wage information at the initial hearings, the commission did not initially set the date to be used in calculating decedent's AWW. However, there are three dates which are clearly undisputed: (1) April 6, 2009,

the day decedent left work due to symptoms caused by his yet to be diagnosed mesothelioma and the last day he worked; (2) May 6, 2009, the day decedent's mesothelioma was diagnosed; and (3) March 19, 2010, the day decedent died.

{¶ 57} Fourth, by finally noting the date of diagnosis on the face of its orders, the commission did not abuse its discretion. Principles akin to res judicata do not apply since that issue was never fully, fairly, actually, or necessarily litigated. The commission never addressed the nature of the claim beyond the fact that it was a death claim.

{¶ 58} This court must determine whether or not the commission abused its discretion when it set decedent's AWW at the statewide maximum. For the reasons that follow, the magistrate finds that the commission did not abuse its discretion.

{¶ 59} R.C. 4123.59(B) provides in pertinent part:

> If there are wholly dependent persons at the time of the death, the weekly payment is sixty-six and two-thirds per cent of the average weekly wage, but not to exceed a maximum aggregate amount of weekly compensation which is equal to sixty-six and two-thirds per cent of the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code, and not in any event less than a minimum amount of weekly compensation which is equal to fifty per cent of the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code, regardless of the average weekly wage; provided however, that if the death is due to injury received or occupational disease first diagnosed after January 1, 1976, the weekly payment is sixty-six and two-thirds per cent of the average weekly wage but not to exceed a maximum aggregate amount of weekly compensation which is equal to the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code.
>
> R.C. 4123.61 provides in pertinent part:
> The **average weekly wage** of an injured employee at the **time of the injury or** at the **time disability due** to the **occupational disease begins** is the basis upon which to compute benefits.
>
> * * *
>
> In death, permanent total disability claims, permanent partial disability claims, and impairment of earnings claims,

the claimant's or the decedent's average weekly wage for the year preceding the injury or the **date the disability due to the occupational disease begins** is the weekly wage upon which compensation shall be based.

(Emphasis added.)

{¶ 60} Two issues are relevant: (1) did the commission abuse its discretion when it used the date of diagnosis as the date upon which to calculate decedent's AWW; and (2) did the commission abuse its discretion by finding that decedent's retirement was not voluntary.

{¶ 61} The magistrate finds: (1) the commission did abuse its discretion by using the date of diagnosis as the date from which to calculate decedent's AWW because R.C. 4123.61 specifically identifies the date of disability as the proper date; and (2) the commission did not abuse its discretion by determining that decedent's retirement was an involuntary departure and finding that decedent's date of disability was April 6, 2009.

{¶ 62} A plain reading of R.C. 4123.61 leads to one conclusion: the date of disability is the proper date to use to calculate AWW. This court came to the same conclusion in *State ex rel. Lemke v. Brush-Wellman,* 10th Dist. No. 95AP-735 (Apr. 23, 1996), when this court found the commission abused its discretion when it relied on *White v. Mayfield*, 37 Ohio St.3d 11 (1988), and used the date of diagnosis as the date from which to calculate the AWW of an injured worker whose claim was allowed for berylliosis. Finding that *White* did not apply, this court stated:

> [In White] the court was dealing with R.C. 4123.85 which sets forth the statute of limitations for a workers' compensation claim. The version of R.C. 4123.85 in effect at that time provided as follows:
>
> " 'In all cases of occupational disease, or death resulting from occupational disease, claims for compensation or benefits shall be forever barred unless, within two years after the disability due to the disease began, or within such longer period as does not exceed six months after diagnosis of the occupational disease by a licensed physician or within two years after death occurs, application is made to the industrial commission or to the employer in the event such employer has elected to pay compensation or benefits directly.' "

The court stated that, for purposes of R.C. 4123.85, disability due to an occupational disease shall be deemed to have begun: (1) on the date the claimant first became aware through medical diagnosis that he was suffering from the disease; (2) on the date the claimant first received medical treatment for the disease; or (3) on the date that claimant first quit work on account of the disease, whichever is the latest. Id. at 14. By its very language, White answered the following question: when does the statute of limitations begin to run on a claim for compensation based upon an occupational disease? White does not set forth the law applicable in interpreting the date of disability for purposes of R.C. 4123.61. As such, the reliance of both the magistrate and the commission on White is misplaced.

\* \* \*

This court finds that the commission erred in applying the rationale of White v. Mayfield to the facts of the present case and abused its discretion in failing to set a "date of disability," for purposes of awarding AWW.

(Footnote omitted.) *Id.* at 2, 6.

{¶ 63} As such, the commission's use of the date of diagnosis here as the date from which to calculate decedent's AWW constitutes an abuse of discretion. The proper date is the date of disability—the date decedent became unable to work due to the allowed conditions in his claim. However, for the reasons that follow, no writ of mandamus is necessary.

{¶ 64} As noted in the commission's August 20, 2013 order, the prior SHO order from the June 27, 2013 hearing was modified, but not vacated. As such, the commission left in place the SHO's determinations that decedent's date of disability was April 6, 2009 and that decedent's retirement was not voluntary. Relator argues that the evidence relied upon by the SHO does not constitute some evidence. Specifically, relator contends that the April 15, and May 15, 2009 office and chart notes of Dr. Okuley, as well as the arguments made by claimant's counsel, do not constitute some evidence that decedent's retirement was not voluntary.

{¶ 65} The SHO stated as follows:

> Minimal information regarding the retirement is on file. However, it is clear that the last date worked was 04/06/2009 (Employer print out attached to memorandum filed 06/27/2013); Mr. Webster had some sort of medical event while at work leading to hospitalization on 04/06/2009 (04/15/2009 office note of Dr. Oukley) [sic]; and Mr. Webster was in surgery for his cancer on 04/30/2009 (05/15/2009 chart note of Dr. Oukley).
>
> The medical records of Dr. Oukley [sic] are found to support the Widow Claimant's argument that Mr. Webster did not take a voluntary retirement for reasons other than his terminal illness. Therefore, this Staff Hearing Officer finds disability due to the allowed condition began on 04/06/2009 based upon the records of Dr. Oukley [sic] dated 04/15/2009 and 05/14/2009.

{¶ 66} The SHO relied on the following evidence to determine the date of decedent's disability and find that decedent's retirement was not voluntary: (1) decedent last worked on April 6, 2009; (2) decedent had some sort of medical event while at work on April 6, 2009; (3) the fact that decedent was hospitalized on April 6, 2009; (4) decedent was in surgery on April 30, 2009; and (5) decedent never returned to work. The SHO specifically pointed to relator's memorandum filed June 27, 2013 and Dr. Okuley's April 15, and May 15, 2009 office notes.

{¶ 67} In relying on Dr. Okuley's April 15, 2009 office note, the SHO noted that office note indicated that decedent had a medical event on April 6, 2009 which led to his being hospitalized. That office note provides as follows:

> SUBJECTIVE: Billie is here for followup after recent hospitalization for AICD discharge on April 6th while at work. He had no loss of consciousness. Felt a little dizzy at the time, but no real chest pain, or palpitations. He felt the AICD discharge. He was admitted to the hospital for evaluation. * * * Also had thoracentesis of about 750 mL on April 6th during his hospitalization, but I do not have the results back on the fluid. He saw Dr. Tita April 8th, and by his description, it sounds like they are moving towards possible pleurodesis in Toledo. He has followup with the cardiologist April 22nd. Currently, he reports he feels a little fatigued, but his shortness of breath has improved since the thoracentesis. Denies any chest pain, he is unaware of any palpitations, or recurrent AICD discharges.

* * *

OBJECTIVE: * * * Lungs notable in that he still has some diminished breath sounds in the right side. No significant wheezing, or rhonchi.

ASSESSMENT/PLAN:

[One] Pleural effusion. He had recent thoracentesis, but I do not have copies of the results of that. He is unaware of any concern for a malignant effusion. He has followup with Dr. Tita. It seems like they are working towards a possible pleurodesis in Toledo.

[Two] AICD discharge April 6th x1. No loss of consciousness. No real prodromal symptoms other than he felt just a little lightheaded. I do not have the results of whether the AICD was downloaded at that time. He does have followup with his cardiologist April 22nd. He is to report to the emergency room immediately for any recurrent discharges, palpitations, chest pain, or other concerns.

{¶ 68} The SHO also discussed Dr. Okuley's May 15, 2009 chart note which discussed his surgery and provided:

SUBJECTIVE: * * * He had lung surgery April 30, with removal of pleural effusion, likely malignant, and pleurodesis procedure, by description. Unfortunately, biopsies of scattered pleural lesions seems to be consistent with mesothelioma.

{¶ 69} These two office notes are evidence that decedent last worked for relator on April 6, 2009 and, due to the mesothelioma, he did not return to work. In its brief, relator points to numerous references which were made while decedent was undergoing chemotherapy and argues that decedent was actually doing well. However, the magistrate notes the fact that decedent was tolerating chemotherapy well is not, as relator argues, evidence that decedent was able to return to work. Instead, the fact that the chemotherapy was not successful and the tumor increased is evidence that the mesothelioma did, in fact, keep decedent from returning to work with relator.

{¶ 70} Relator cites two cases where injured workers developed occupational diseases, specifically, mesothelioma and asbestosis, retired from work, later filed claims, and ultimately died as a result of those occupational diseases. In both cases, the Supreme Court of Ohio found that the injured workers' retirements were voluntary. Relator argues that those cases warrant the same determination here: that decedent's retirement was voluntary and not related to his mesothelioma. For the reasons that follow, the magistrate disagrees.

{¶ 71} The first case is *State ex rel. Thompson v. Ohio Edison Co.,* 85 Ohio St.3d 290 (1999). In that case, Charles Thompson retired from his job with Ohio Edison Company on April 1, 1991. At the time, he was not experiencing any symptoms. Two years later, on February 22, 1993, Thompson was hospitalized complaining of shortness of breath, and, on March 8, 1993, Thompson was diagnosed with mesothelioma. Less than three weeks later, Thompson died.

{¶ 72} Thompson's widow applied for death benefits and the commission set the amount of death benefits at $230 per week. Thompson's widow asked the commission to reconsider and determine Thompson's AWW by dividing his wages for the last year of employment by 52. The commission did not and she filed a mandamus action, wherein she argued that the rate of death benefits set by the commission was substantially unjust and merited a departure from R.C. 4123.61's standard AWW formula because special circumstances existed. The Supreme Court disagreed finding that Thompson had no future compensation to lose as he had withdrawn from the labor market without evidence of an intent to re-enter the workforce. The court found that Thompson's retirement was voluntary and not related to his mesothelioma.

{¶ 73} The other case relator cites is *State ex rel. Hiatt v. Indus. Comm.,* 99 Ohio St.3d 32, 2003-Ohio-2453. James F. A. Knowles applied for a normal service retirement in September 1985 when he was 65 years of age. Knowles' retirement was to be effective three months later. Prior to the effective date, Knowles saw a physician complaining of minimal respiratory difficulties. His physician diagnosed asbestosis, opined that Knowles was 25 percent impaired, and instructed him to have yearly pulmonary tests, as well as an annual vaccination against pneumonia and flu.

{¶ 74} Four years later, in 1989, the commission allowed an occupational disease claim for asbestosis and specifically noted that Knowles had sustained no compensable lost time. In 1992, Knowles was still doing well. Chest x-rays taken at that time led his physician to suspect primary bronchogenic carcinoma and further testing was recommended; however, Knowles refused further testing because he was feeling well. Unfortunately, Knowles died from metastatic lung cancer four years later in 1996.

{¶ 75} The commission allowed Knowles' widow the minimum death benefit payable for the year preceding Knowles' death pursuant to R.C. 4123.59. Knowles' widow sought an increase in the AWW asking that it be determined for the year prior to the diagnosis of asbestosis rather than the standard AWW for the year prior to the onset of disability. The commission disagreed citing the *Thompson* decision.

{¶ 76} In rejecting her arguments, the Supreme Court stated:

> [Knowles' widow] generally claims that the commission should have found that decedent's diagnosis date governed the award of death benefits and that decedent's AWW should be calculated based upon earnings for the year prior to that date. This court has previously resisted, however, pegging a claimant's disability date to the date of diagnosis, noting instead that disability is the inability to work. State ex rel. Preston v. Peabody Coal Co. (1984), 12 Ohio St.3d 72, 73-74, 12 OBR 63, 465 N.E.2d 433. [Knowles' widow] reluctantly concedes—as she must—that her decedent had no legally cognizable date of disability.
>
> * * *
>
> [Knowles' widow] seeks to distinguish Thompson by arguing that her decedent—unlike Thompson—worked the year prior to diagnosis. While true, it is an irrelevant distinction, since date of diagnosis is not germane to compensation calculation. Accordingly, [Knowles' widow]'s assertions concerning lack of disability and character of disease merely echo those already discussed and discarded in Thompson and do not advance her cause.
>
> [Knowles' widow] also claims that the commission's calculation penalizes dependents of those with long-latency occupational diseases by arguing the concepts of "zero AWW" and "zero compensation" interchangeably. But zero AWW does not translate into no compensation. R.C.

> 4123.59(B) specifically states that dependents of those killed by industrial causes must receive at least 50 percent of the statewide AWW. Moreover, since the purpose of workers' compensation benefits is to replace future earnings, [Knowles' widow]'s pursuit of wages that her decedent long ago voluntarily relinquished by his retirement from the labor force for reasons unrelated to any industrial injury or occupational disease.

(Emphasis sic.) (Footnote omitted.) *Id.* at ¶ 7, 11-12.

{¶ 77} In the above cases, both Thompson and Knowles retired before they experienced any symptoms, disabling or otherwise, from the occupational diseases. In fact, no argument was even made that their retirements were based at all on those diseases. Here, there is some evidence in the record from which the commission could determine that decedent went to the hospital on April 6, 2009 because he was experiencing symptoms directly related to the mesothelioma; decedent then had surgery, followed by chemotherapy, followed by his death 10 months after the date of diagnosis and 11 months after he last worked. This constitutes some evidence that decedent was disabled as of April 6, 2009 and his retirement was based in part on the mesothelioma. As such, the magistrate finds the commission did not abuse its discretion by finding decedent's retirement was not voluntary.

{¶ 78} While the commission improperly used the date of diagnosis to calculate decedent's AWW, the magistrate finds that, because the date of diagnosis was one month after the date of disability, returning the matter to the commission is unnecessary since the AWW of decedent will remain at the statewide maximum.

{¶ 79} To the extent relator argues that the commission relied on statements made by counsel which do not constitute some evidence upon which the commission could rely, the magistrate notes the commission cited to the specific evidence above enumerated, that does support the commission's determination. As such, even if the commission relied in part on counsel's statements, the other evidence cited by the commission constitutes some evidence supporting the commission's ultimate determination.

{¶ 80} Based on the foregoing, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA BROOKS

### NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).